UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Wealth Enhancement Group, LLC, | Court File No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Julie Darrah, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Wealth Enhancement Group, LLC ("WEG"), by and through it attorneys, files this Complaint against Julie Darrah ("Darrah") and alleges as follows:

## NATURE OF THE LAWSUIT

1. Over the course of two decades, Defendant Julie Darrah established herself as a business leader in Orcutt, a tight-knit community in rural California. Starting as an office assistant, Darrah became a leading financial planner and co-founder of Vivid Financial Management, Inc. ("Vivid"), a registered investment adviser and wealth management firm. Along the way, Darrah curated her reputation as a wealthy community patron, backing a local restaurant, bakery, and sausage factory. She is also the head of the town senior center. For vulnerable clients, Darrah was more than a financial advisor: she spent many years—for some clients, over a decade—gaining their trust by incrementally inserting herself into their lives as "the daughter they never had."

2. For years prior to her affiliation with WEG, however, Darrah was deceiving those around her, including sophisticated financial institutions, to covertly steal from a small number of specifically targeted clients who trusted her. She did so not only by defrauding the clients and their families, but also by deceiving her own office staff and evading multi-layer anti-fraud

safeguards of multiple leading financial institutions.  Darrah covered her tracks by ingratiating herself into her clients' family affairs, visiting them at home and assisted living facilities, counseling them as they grieved, accompanying them on medical appointments—all in ways that ran afoul of financial advisor professional boundaries.  Darrah abused her clients' trust, arranging for them to meet with a disbarred attorney, who prepared documents appointing her as trustee and beneficiary of client trusts, providing her power-of-attorney authority over clients' bank accounts (accounts held by third parties that were outside of the scope of their advisory relationship with WEG), and, on information and belief, even vesting her with medical and healthcare decision-making authority over those who did not question her bona fides.  From there, Darrah repeatedly used her ill-gotten authority over client affairs to transfer several million dollars of their savings to herself by directing transfers to a seemingly appropriate client account controlled by a third party bank, and then funneling that money to herself.

3.      Darrah took extraordinary steps to evade detection for more than a decade, beginning long before her relationship with Plaintiff and continuing thereafter.  She did so by using her touted experience in complex financial planning to evade compliance and anti-fraud safeguards, including by:

- Unlawfully impersonating clients to multiple banking and financial institutions— including a leading custodian with over $1 trillion under management—to process transactions for her own benefit that clients did not want or know about;

- Subverting modern anti-fraud safeguards by, for example, impersonating clients by using her personal email address and personal mobile phone to "multi-factor authenticate" illicit transactions, thus also falsifying the identity of the client purportedly requesting a transaction in submissions to client account custodians;

- Moving money across multiple accounts at multiple banks—including two of America's top-ten banks known for sophisticated fraud-detection programs—such that no one institution could see the big picture;

- Falsifying Vivid's books and records by omitting reference to her role as trustee and attorney-in-fact for clients—knowing that omitting reference to those roles violated the

federal securities laws, violated her fiduciary and professional duties, and presented conflicts of interests;

- Forging client checks and signing other client documents as if she were the client; and

- Lying to subordinate personnel at Vivid by instructing that clients "requested" transactions where they had not, and then admonishing personnel *not* to speak directly to some victims (who, she would say, "only know Julie").

4.      Darrah hid all of this from trusting clients, including several in their eighties, and at least one who resides in a memory-care facility where the administration reportedly requires Darrah to approve visits, even by other family members.

5.      Years into her concealed scheme, Darrah and her Vivid partners negotiated the sale of most of the Vivid assets to Plaintiff WEG—a transaction that closed in December 2021 (the "Vivid Transaction").  As part of rigorous due diligence, WEG scrutinized Vivid's books and records that Darrah had already ensured did not fairly reflect her undisclosed control over clients and theft of their savings.  Indeed, the books and records available to WEG reflected facially appropriate transfers from a client account to a like-titled client account under the control of a third party bank, without any disclosure that Darrah secretly controlled that third-party bank account—it was not until the funds were in that third-party account, completely outside of WEG's visibility, when Darrah again transferred funds to an undisclosed account that Darrah herself owned.  WEG also asked Darrah if she was serving as a trustee of any client accounts; she directly lied, disclosing only a few instances where she served as a successor (essentially, understudy) trustee (omitting other successor trustee roles, as well).  Darrah then falsely certified to WEG that she was operating the business in compliance with the law.  After the Vivid Transaction closed, Darrah continued to deceive WEG through the very same fraudulent means that had been deceiving billion-dollar banks, custodians, and others, for many years.

6.      Upon learning of Darrah's potential misconduct, WEG immediately placed her on leave, removed her from the premises, shut down her access to client accounts, and soon thereafter terminated her for cause.  Since then, Darrah doubled down on her cover-up, refusing—in violation of her professional and contractual obligations—to assist WEG's investigation, protect clients, and cooperate with authorities.  And even after getting caught, Darrah has persisted in her attempts to conceal her conduct by approaching her victims to influence them with assurances of recompense and requests to sign backdated documents.

7.      WEG is committed to making its clients whole for misconduct by Darrah while employed by WEG, and now brings this action to recover the damages they and it suffered from Darrah's fraud and wrongdoing.  WEG also seeks to recover from Darrah for damages it sustained in connection with the Vivid Transaction; the post-transaction fraud that Darrah perpetrated and concealed; Darrah's lying, stealing, and breaching fiduciary and contractual duties; and for exposing WEG clients to harm during the brief time she was associated with a firm that she knows places integrity and client trust above everything.  WEG also seeks injunctive relief preventing Darrah from doing any more harm to the clients she was stealing from for so many years before any association with WEG.

## PARTIES

8.      Plaintiff Wealth Enhancement Group, LLC is a Minnesota Limited Liability Company with its principal place of business located in Plymouth, Minnesota, and with its sole member residing in Minnesota.  WEG is a national independent wealth management firm, founded in 1997, with more than $70.8 billion in total client assets, which provides comprehensive wealth management solutions, including financial and retirement planning, investment management, estate planning, trust services, and tax preparation.

9.     Defendant Julie Darrah is an individual who resides in California and served as Vivid Financial Management, Inc.'s co-founder and Director of Wealth Management from May 2015 through the 2021 close of the Vivid Transaction.  Darrah also served as Vivid's Chief Compliance Officer, which she prominently touted as one of her credentials to help people navigate through complex financial situations.  Following Vivid's sale of assets to WEG, Darrah served as Senior Vice President, Financial Advisor of WEG from January 2022 until July 2023 when she was relieved of all duties, placed on leave, and thereafter terminated, for cause, on September 15, 2023.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action because the parties are diverse and consented to the jurisdiction of this Court pursuant to Section 10.4 of the Asset Purchase Agreement ("Forum Selection Clause"), which states as follows:

> The validity, interpretation, performance and enforcement of this Agreement will be governed by the laws of Minnesota. Any action at law, suit in equity, or judicial proceeding arising directly, indirectly, or otherwise in connection with, out of, related to, or from this Agreement, or any provision hereof, shall be venued only in federal or state court located in Hennepin County, Minnesota. Each party waives any claim of inconvenient forum or right such party may have to transfer or change the venue of any such action.

11.     Venue is proper in this Court under 28 U.S. Code section 1391, by consent pursuant to the Forum Selection Clause.

## FACTUAL ALLEGATIONS

I.    **WEG's Acquisition of Vivid Assets and Related Agreements.**

12.     Vivid billed itself as a holistic asset and wealth management business—co-founded by Darrah—offering an array of financial planning services, including tax, estate and insurance planning, as well as asset management services and retirement planning support.

Based on the foregoing, WEG understood that Vivid shared WEG's values of a "client-centric" approach to delivering advice and making business decisions, and that Vivid provided a high level of care to its clients, making it an attractive acquisition target.  Thus, in or around August 2021, WEG began exploring a possible transaction to acquire some of Vivid's assets.

13.     As part of rigorous due diligence, WEG scrutinized Vivid's books and records, including financial information and documents that did not fairly reflect Darrah's undisclosed control over client accounts, or her theft of client funds.

14.     Darrah also made false representations to WEG in conjunction with its consideration of the transaction with Vivid.  In particular, on November 4, 2021, Darrah lied in response to a direct inquiry from WEG regarding whether she was serving as a trustee or a successor trustee of any client accounts, to which she falsely responded: "I am only a successor trustee in line after others. I'm not currently acting as trustee on any of our clients."  Darrah followed up a few days later disclosing to WEG only a few instances where she served as a successor trustee (meaning she would take over management of the trust if the current trustee died or became incapacitated) and omitted other successor trustee roles.  She never disclosed that she or Vivid had custody (as defined in the securities laws) of client trust or other accounts.   She never disclosed that the Vivid books and records were inaccurate insofar as they did not disclose that she was serving as the trustee of client accounts, much less that the reported client account records and balances falsely reflected transactions that were unauthorized by the clients and undertaken unlawfully by Darrah for her personal benefit.

15.     In substantial reliance on Darrah's lies and material omissions—including the very same concealment that had evaded detection for years by leading financial institutions—and in reliance on extensive due diligence (which Darrah ensured would not reveal the truth) on

November 11, 2021, WEG entered into an Asset Purchase Agreement ("APA") with Vivid, Darrah and other Vivid shareholders, agreeing to acquire certain of Vivid's assets. The Vivid assets WEG purchased ("Acquired Assets") included a list of current Vivid clients ("Current Clients"), the amount of recurring annualized revenues for fee-based investment advisory services from each of the Current Clients, databases or lists of prospective clients, personal property (i.e. computers, equipment, furniture, supplies), Vivid's contractual rights (including to contracts with consenting Current Clients), and rights to Vivid's name, website, and telephone numbers.

16.     In addition to misleading WEG during due diligence, Darrah made a long list of representations and warranties to WEG through the APA, which WEG recently learned are false, including that: (1) there was no threat for Darrah to be made a party to any action, suit, proceeding, hearing, or investigation of, in or before any federal state or local agency (¶ 4.5); (2) there are no defects in the Acquired Assets or other conditions relating to any Acquired Assets which, in the aggregate, materially adversely affect Vivid or the operation or value of the Acquired Assets (¶ 4.6); (3) all contracts provided to WEG through due diligence were legal, valid and binding agreements, enforceable in accordance with their terms (¶ 4.9); (4) since January 1, 2016, Darrah had complied with all laws and regulations applicable to Vivid (¶ 4.10); (5) the client list provided to WEG was accurate and complete, Darrah had no reason to believe that any material portion of client assets would be withdrawn or that any Current Clients would cease doing business with Vivid following the Closing Date, and Vivid provided WEG complete access to all files in their possession with respect to the Current Clients (¶ 4.11); (6) Darrah was not engaged in any material business other than Vivid and had disclosed all outside business

activities ("OBAs") to WEG[1] (¶ 4.13); and (7) Darrah did not withhold any material facts relating to Vivid or the Acquired Assets from WEG; no representation or warranty the APA contained any untrue statement of a material fact or omitted a material fact required to make statements in the APA not misleading; and Darrah was not aware of any change, event or occurrence that took place or is pending that has, or in the future could reasonably be expected to have, a material adverse effect on the value or ownership of Vivid or the Acquired Assets (¶ 4.20).  Darrah reaffirmed these representations on December 31, 2021, providing a "Shareholders' Certificate" certifying that all of the foregoing representations were true and correct as of the Closing Date.

17.     Because Darrah was perceived by WEG to be a "Key Person" to Vivid's business, as defined in the APA, a condition for closing of the Vivid Transaction was for Darrah to enter into a Senior Vice President Advisor Agreement.  In turn, Darrah and WEG entered into a November 11, 2021 Senior Vice President Financial Advisor Agreement ("Advisor Agreement"), pursuant to which Darrah became a WEG employee, an investment adviser representative for WEG, and a financial planner for clients of WEG and its subsidiaries as of the Closing Date, subject to and in accordance with applicable law and the terms and conditions of the Advisor Agreement.  Through the Advisor Agreement, Darrah agreed, among other things, to: (1) follow all company policies and procedures (¶ 1); (2) devote her full business-time, energy and attention to WEG (¶ 5); (3) comply with applicable federal, state, and local laws and regulations and WEG policies and procedures (¶ 5); (4) submit complete and accurate applications for the services and other financial information required by WEG to comply with

---

[1] In the Disclosure Schedule to the APA, Darrah disclosed that she was affiliated with the following OBAs only: PC&J Joint Ventures, Central Coast Palate, Wanderlust Foods, LLC, Orion III Holdings, LLC, Bradley Building, 2Thirty3, LLC – Rental Properties 15% interest, Marian Regional Medical Center Foundation – Board member, and Oasis Inc. – Board member.

legal, regulatory, underwriting or WEG's internal processing requirements (¶ 5(c)); and (5) cooperate with inspections (¶ 6(b)). Darrah also agreed that the hundreds of thousands of dollars she received in compensation from WEG pursuant to the Advisor Agreement was subject to her continuing compliance with applicable federal and state regulatory requirements and the policies and procedures of WEG and its affiliates (¶ 4(d)). And Darrah agreed that, if she was terminated, she would not directly or indirectly represent WEG or use its confidential information (¶ 9(a)).

18.     Darrah's execution of a November 11, 2021, Restrictive Covenants Agreement ("RCA") was also a condition for closing the Vivid Transaction. In the RCA, Darrah agreed that she would materially benefit and receive significant consideration from the transactions contemplated by the APA and, in exchange for such consideration, she agreed, among other things, not to use any of Vivid's confidential information—including any client information—in a manner not directly related to and required by the performance of her duties to WEG (¶ I(a)).

19.     The Vivid Transaction closed on December 31, 2021 (the "Closing Date"), with WEG paying all amounts due under the APA and related documents. Darrah has received well in excess of the $75,000 jurisdictional minimum in connection with the APA and, but for her illicit conduct and breaches of contract, she could have potentially earned even more.

## II.     **Darrah's 10+ Year Long Fraudulent Scheme to Steal from Clients.**

20.     WEG is informed and believes that, since 2016, Darrah has misappropriated, several million dollars of client funds—the great majority *before* the Vivid Transaction—in violation of the law and, beginning in 2022, also in violation of WEG policies and business practices. Darrah has effectuated this scheme and avoided detection for many years by targeting vulnerable clients (some living in assisted care facilities), forming close relationships with them

(including by taking them to medical appointments, taking them shopping, and taking them to hair appointments) to gain their trust, impersonating them, and gaining control of their finances to circumvent internal controls.

21.    Darrah was able to circumvent other financial institutions' (and later WEG's) internal controls and steal millions from a subset of her clients, without detection, for many years by, among other things: (1) impersonating clients by changing the email address, telephone number, and mailing address on client accounts to her own, without the clients' knowledge or consent, to overcome multi-factor authentication controls and ensure that statements and letters from the banks holding client funds confirming account changes and withdrawals/transfers would never reach affected clients; (2) opening new bank accounts for clients (outside of WEG's and its custodians' custody) to then route money to her own accounts; and (3) assisting clients in changing their trusts to name Darrah as their trustee—something prohibited by WEG and by law—which she would facilitate by arranging for a disbarred attorney whom she has known for 30+ years to create such trusts, and then using that trustee authority to move money from clients' trust depository accounts (outside of WEG's control and oversight) to her own accounts.

22.    Darrah concealed her wrongdoing in many ways, starting years before the Vivid Transaction.  Darrah lied to subordinates to effectuate client transfers for her own personal gain (i.e. telling them that transfers were directed by a client when they were not).  She also made false representations that she was not, in fact, serving as an active trustee for any clients, and was rather only serving as a successor trustee for seven clients (meaning she would take over management of the trust if the current trustee died or became incapacitated).  Darrah made these representations via numerous compliance certifications/attestations, including in response to a February 2023 request from WEG's Director of Compliance specifically asking Darrah whether

she was serving as a trustee for any clients. But perhaps most egregiously, WEG is informed and believes that Darrah concealed her wrongdoing by assuming and exercising legal control of her client's financial affairs and—in some instances—isolating them from their families to evade detection, convincing clients to give her Power of Attorney over their affairs (including over their medical decisions), and most recently using that control to prevent a client's own family from visiting them in their assisted care facility.

23.     On information and belief, Darrah further concealed her illicit activity by intercepting client mail to hide the fact that she changed the email address and telephone number on the clients' trust account to her own. Multi-billion dollar custodians utilized by WEG's clients send written letters to clients when a change is made on their account to ensure that it was valid and authorized. Yet, clients reported that they were not aware of these changes. Darrah lived very close to many of these clients and it would have been relatively easy for her to ensure that those letters did not make their way to the clients. And in at least some instances, Darrah minimized the risk of her detection by requesting that clients go "paperless," such that most of the financial institutions holding client assets would send account statements and notifications to an email account under Darrah's own control, further depriving those clients of the ability to detect Darrah's unauthorized transactions.

24.     At this time, WEG is aware of a small number of specifically targeted clients whom WEG reasonably believes Darrah stole from through this scheme, remaining undetected for many years—with the majority of the theft occurring before WEG had any involvement with Darrah. Of course, Darrah failed to disclose any of the foregoing information to WEG before or after the Vivid Transaction. Among the most egregious examples are as follows, with names omitted and replaced with aliases for client privacy and protection:

**A.  Darrah's Covert and Concealed Fraud and Theft from a Client With Dementia.**

25.     Victim 1 ("V1") is an 83-year-old widow with dementia and memory loss who had been a Vivid client since August 2012 (and since last year, a WEG client).  Although V1 lives in a memory care facility, her address of record with the financial institution that for years held custody of her assets is a property owned by Darrah (through her trust) and located on the same street as Darrah's home.  Since 2017, around $1.4 million has been withdrawn from V1's accounts, which WEG believes was withdrawn by Darrah or at Darrah's direction and for her benefit.   By doing so, Darrah exploited V1's circumstances to avoid detection.

26.     Pursuant a March 31, 2021 entry in Salesforce, Darrah created a new bank account for V1 outside of WEG's control or visibility.  The entry states: "set-aside $50k and froze account. Will follow up next week to unfreeze trading if transaction has occurred [sic]. Please get funds ready.  We will be opening a new bank account and changing MM but for now sell 50K and leave in cash."  On information and belief, although Darrah falsely represented to subordinate Vivid personnel that the new account was created to help V1's daughter buy a house, this, in fact, was a bank account with Community Bank of Santa Maria that was controlled by Darrah and that she used to conceal transfers from V1's Vivid account directly to her own account.

27.     On information and belief, on April 6, 2021, Darrah impersonated V1 to execute a move money authorization via Docusign for her trust account (an account outside of WEG's control or visibility), which changed the destination account for outbound transfers to the Community Bank of Santa Maria.  The Docusign certificate associated with V1's purported signature shows the document was accessed using V1's email account and authenticated using Darrah's telephone number.  The IP address used to access this Docusign form has also been

linked to Darrah.  After April 6, 2021, data shows there were 63 withdrawal transactions from this account totaling approximately $351,000.

28.    On August 23, 2022, Darrah instructed subordinate personnel to change V1's telephone number of record at the custodian of her funds to a telephone number linked to Darrah's then-deceased aunt.  V1's custodian account also appears to be linked to a personal Gmail email address identified as used by Darrah.  In addition, on December 22, 2022, an agreement calling for V1's signature listed Darrah's personal telephone number as V1's telephone number and was e-signed via Docusign.  It also appears that the email address attributed to V1 for Docusign purposes on this agreement was controlled by Darrah and linked to Darrah's personal email address.

29.    On information and belief, on June 1, 2023, Darrah impersonated V1 to execute a move money authorization submitted to the external custodian, in violation of that institution's procedures, via Docusign for V1's IRA.  Notes in Salesforce indicate that Darrah's personal mobile number and personal email address were referenced for payment confirmation, stating as follows: "Per JD [Darrah], please prep MM form to assign Community bank account to the ROTH IRA. Please let me know once this is complete and I will process a transaction for the client. [Darrah email address] cell phone number for verification: [Darrah's cell number]." Similarly, the telephone number on this money movement form attributed to V1 is Darrah's personal number, and the Docusign tracking data confirmed that the email address attributed to V1 was Darrah's personal email address and the mobile phone used for SMS authentication was Darrah's personal number.  The Docusign form was set up for signature by a WEG employee and purportedly sent to V1 at Darrah's personal email address.  On the same date, a withdrawal of $9,343 was processed, which closed the account.  Per the following note in Salesforce, this

withdrawal was made at Darrah's direction to a Vivid employee, whom she misled into believing

this was a legitimate client-directed transaction: "Per JD, send full liquidation to Community

Bank from ROTH."

30.     At the time of the Vivid Transaction, V1's already-depleted account balances

totaled approximately $521,000 and were reduced to around $66,000 as of August 2023.  On

information and belief, the majority of these withdrawals were undertaken by Darrah and for her

benefit, again with most of the funds misappropriated before she had any relationship with WEG.

31.     WEG is informed and believes that, earlier this month, V1's sister and niece—

who are themselves victims of Darrah's fraud and are deeply concerned over what Darrah has

done to V1—went to visit V1 at the memory care facility and take her to lunch.  However, the

clinical staff at the facility declined the family members' request because the facility has been

instructed that only Darrah can legally authorize V1 to leave the facility.  On information and

belief, Darrah is the trustee, Power of Attorney, and healthcare proxy for V1 pursuant to legal

documents prepared by the disbarred attorney who has known Darrah for decades.

**B.  Darrah's ~10-Year Long Covert and Concealed Scheme to Defraud and Steal from Vulnerable Client While Evading Detection.**

32.     Victim 2 ("V2") is an 85-year-old widow.  V2 had been a Vivid client since, at

least, May 2015, and since 2022, a WEG client.  WEG is informed that, in the past, V2 has

repeatedly represented that Darrah is the only person she trusts.  Darrah violated that trust,

stealing hundreds of thousands of dollars from V2.

33.     As early as 2014, Darrah's phone number was linked to a credit report filing for

V2.  Since 2016, around $850,000 has been withdrawn from V2's accounts, which WEG

believes was withdrawn by Darrah or at Darrah's direction and for her benefit.  According to

V2's family, the family recently reviewed bank statements from 2016 showing that Darrah transferred around $575,000 from V2's bank account to Darrah's personal bank account.

34.     In June 2018, V2 purportedly made a $100,000 "loan" to Darrah from her trust account, under an atypical, unsecured note with a low interest rate (2%) and other unusual terms.  Darrah never disclosed this loan to WEG, nor is there any trace of it on the Vivid books and records that WEG reviewed prior to the Vivid Transaction.

35.     According to V2's daughter-in-law, the family has also determined that Darrah has been paying her Waste Management bill using money stolen from V2.

36.     At the time of the Vivid Transaction, V2's already-depleted account balances totaled approximately $350,000 and are now down to around $13,000.  On information and belief, most—if not all—of these withdrawals were by Darrah or for her benefit.

37.     On February 11, 2023, V2 opened a new individual account with a major financial institution.  The application for the account lists Darrah's personal email address for V2, and included the election of electronic statement delivery.  On that same day, V2 purportedly signed a move money authorization form for the same account.  After February 11, 2023, there were two withdrawals from this account totaling approximately $43,000.

38.     It also appears that, in April 2023, Darrah's personal email address was used to impersonate client execution of a document of V2 via DocuSign.  Within two minutes thereafter, seven wires began coming out of V2's trust account, totaling $80,400.

39.     Recent reports from V2 and her family further corroborate the foregoing.  V2, her daughter, and her daughter-in-law recently reported to WEG that they are confident that Darrah stole money from V1 and V2.  They also reported that Darrah arranged for V2's trust to be established using the same disbarred attorney noted above who established V1's trust.  The trust

documents show V2's trust was amended in December 2022 to not only name Darrah as the successor trustee, but also a *beneficiary* of the trust (along with two of V2's children), and also named Darrah as executor of V2's will.  Darrah is also appointed as attorney-in-fact for V2 if V2's son is unwilling or unable to act in that capacity, through a December 14, 2022 Power of Attorney that WEG is informed was also established by the disbarred attorney.

**III.**    **Darrah's Motive for her Fraudulent Scheme: Funding Other Failing Businesses She Controlled, Including Outside Business Activities Concealed from WEG.**

40.    WEG's investigation further revealed that Darrah is personally involved with a significant number of OBAs—including a deli, bakery, restaurant, sausage company, concrete company, owning and managing various buildings—many of which she failed to disclose to WEG and which were not revealed through the credit check and background check performed on Darrah in connection with the Vivid Transaction.  She failed to disclose the OBAs in the APA schedules, in violation of her representation in the APA.  She also failed to disclose OBAs in response to an outreach by WEG during its normal course of business, in violation of WEG's internal policy which requires disclosure and approval of any OBAs.

41.    Even for the OBAs that Darrah had disclosed, she did not seek permission from WEG to actually conduct those businesses at the WEG office, or use WEG personnel to do so, as multiple WEG personnel and company records have since confirmed.  And, on information and belief, Darrah dedicated a significant amount of time, energy and attention to many of the OBAs, also in violation of her Advisor Agreement.

42.    On information and belief, some of Darrah's OBAs are losing money.  On information and belief, in an effort to keep these OBAs afloat, Darrah has purportedly "loaned" her failing OBAs around $3.6 million, which she apparently has been funding with money that she has been stealing from clients since before the Vivid Transaction.

43.     For recent examples after the Vivid Transaction, on December 28, 2022, Darrah directed a withdrawal of $45,000 out of V2's account and ultimately into a bank account at a different financial institution controlled by Darrah.  On this same day, Darrah withdrew $38,000 from her account, and deposited a total of $38,000 into accounts for two of her OBAs.  In addition, between April 12 and April 14, 2023, Darrah directed a withdrawal of $50,000 from V2's account, ultimately directing $38,000 into a bank account controlled by Darrah.  On April 17, 2023, Darrah withdrew $42,100 from her account, and deposited $42,100 into an account for one of her OBAs.

IV.     **Regulatory Inquiry.**

44.     On July 17, 2023, WEG received a regulatory inquiry seeking, inter alia, documents relating to certain Vivid clients who became WEG clients through the Vivid Transaction, with a specific focus on Darrah's relationship with those clients.  WEG takes compliance with all laws and regulations, and maintaining a positive relationship with regulators, very seriously.  WEG is fully cooperating with regulators.

45.     In addition, given its commitment to protecting clients and maintaining their trust, it immediately placed Darrah on leave and launched a thorough investigation (including a forensic review) into the subject matter of the regulatory inquiry and, more generally, Darrah's activities both before and after the Vivid Transaction.  WEG repeatedly sought Darrah's cooperation with its investigation on at least five occasions: July 24, July 28, July 29, August 1, and August 6, 2023.  Yet Darrah persisted in efforts to hide her 10+ year-long fraudulent scheme by refusing to cooperate with WEG or answer any of its questions.  Ultimately, as further detailed herein, WEG's investigation revealed that Darrah had been carrying out a scheme to

defraud clients, custodians of client assets, regulators, other Vivid employees, and WEG for many years.

**V.      WEG Terminates Darrah Who Continues to Attempt to Conceal Her Wrongdoing and Interfere with the Investigation.**

46.     On September 15, 2023, WEG terminated Darrah for cause.  Thereafter, on information and belief, Darrah has doubled down on her concealment, engaging with at least three clients/victims to cover her tracks.

47.     For example, a few weeks ago, while on leave, Darrah reportedly visited V2 at her home and told V2 that she would always take care of her, "whatever it takes."  In an attempt to portray herself as the victim, Darrah also lied to V2 about the cause for WEG's investigation, falsely stating that someone in the Vivid office "turned her in" for unrelated personal reasons. Darrah promised V2 that she would pay her back by September 14, 2023—even borrowing money if necessary to do so.

48.     Darrah similarly promised V2's son that she would pay back the money she stole from V2 within a week (which has now passed).  Darrah attempted to justify her pervasive theft and fraud by telling V2's son that she has taken care of V2 for 12 years and that V2 told Darrah that she could take money from V2 when she needed to.  On information and belief, Darrah has not repaid any money to V2.

49.     On information and belief, on September 20, 2023, Darrah also reportedly went to the home of Victim 3 ("V3"), an older person who has had a relationship with Darrah since 1992—thirty years before the Vivid Transaction.   On information and belief, Darrah persuaded V3 to sign backdated promissory notes to conceal her prior theft of an aggregate of $200,000 from V3 in August 2021 and summer of 2023, by papering it as "loans."

50.      Another longtime Vivid client reported to WEG that he was "recently" on a call with Darrah—within the past three weeks, well after she had been placed on leave and instructed to not contact clients.  Given Darrah's improper outreach, this client was surprised to learn that she was no longer with WEG.  Because at the time of this call, Darrah was either on leave or had already been terminated from WEG, she not only had been instructed *not* to contact clients, she had no legitimate reason to be reaching out to this or any client.

51.      On September 21, 2023, WEG sent a cease and desist to Darrah, in hopes of protecting its clients and of preventing Darrah from further hindering and interfering with its investigation and contacting potential victims.  WEG is committed to making clients whole for any misconduct during the time it employed Darrah.  WEG now brings this action to ensure that Darrah cannot continue harming its clients and to recover for harm caused by Darrah's lies, concealment, betrayal, and violations of her various contractual and legal obligations.

## CAUSES OF ACTION

## COUNT ONE

### (Fraudulent Inducement)

52.      WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 51 of this Complaint as though fully set forth herein.

53.      As described above, Darrah made misrepresentations and omissions of past or present material facts—or simply invented facts—in order to induce WEG to enter into the APA. These misrepresentations and omissions of material facts include, but are not limited to: (1) providing Vivid's books and records, including financial information and documents, that did not fairly reflect Darrah's undisclosed control over client accounts or that client account records and balances falsely reflected transactions that were unauthorized by the clients and undertaken

unlawfully by Darrah for her personal benefit; (2) Darrah's November 4, 2021 representation to WEG that "I'm not currently acting as trustee on any of our clients" and failure to disclose all of her other successor trustee roles with clients; (3) failure to disclose that she or Vivid had custody (as defined in the securities laws) of client trust or other accounts.

54.     Darrah made the foregoing misrepresentations and omissions with knowledge of their falsity and with intent to induce WEG to enter into the APA.

55.     Darrah's representations and omissions described above were material to WEG's decision to enter into the APA, and were likely to induce a reasonable person to manifest his or her assent to the contract.

56.     WEG justifiably relied on Darrah's material misrepresentations and omissions in agreeing to enter into the APA, and WEG would not have entered into the APA if WEG had known the truth concerning Darrah's misrepresentations and omissions.

57.     WEG suffered damages as a direct and proximate result of relying on Darrah's misrepresentations and omissions, in amounts to be proven at trial.

58.     As a result of Darrah's material misrepresentations and omissions, the APA is voidable by WEG, and WEG is entitled to rescind the contract.

<u>**COUNT TWO**</u>

**(Fraud Following Execution Of The APA)**

59.     WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 58 of this Complaint as though fully set forth herein.

60.     As described above, Darrah made misrepresentations and omissions of material facts following the execution of the APA.  These misrepresentations and omissions of material facts include, but are not limited to: (1) failing to disclose that she was serving as a trustee for

clients—in violation of law and WEG policy—and expressly lying to and misleading WEG into believing that she was only serving as a secondary trustee on some client accounts, omitting others; (2) failing to disclose OBAs of which she was heavily involved with, using WEG staff to help operate, and running out of WEG's office; (3) failing to disclose personal loans she received from clients; (4) on information and belief, forging client documents; (5) instructing personnel to effectuate client transactions that she misrepresented were approved by clients; (6) failing to disclose that she had caused client accounts to be linked to her telephone number, email address, and mailing address for properties she owned; and (7) failing to disclose that she had been stealing millions of dollars from clients.

61.     Darrah made the foregoing misrepresentations and omissions with knowledge of their falsity and with intent to induce reliance by WEG.

62.     Darrah's representations and omissions described above were material to WEG.

63.     WEG justifiably relied on and acted on Darrah's misrepresentations and omissions.

64.     WEG suffered damages as a direct and proximate result of relying on Darrah's misrepresentations and omissions, in amounts to be proven at trial.

## COUNT THREE

### (Negligent Misrepresentation)

65.     WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.     Darrah, as a Senior Vice President of WEG, owed a duty of care to WEG.

67.     As set forth above, while employed by WEG, Darrah supplied false information to WEG that WEG used to guide its own business transactions, including falsely representing

that she was acting in accordance with the law in her business activities, that she did not serve as

a trustee for any clients, and that transactions she directed employees to execute were directed by

clients.

68.     In addition, Darrah failed to use reasonable care or competence in communicating

the above-referenced information to WEG.

69.     In doing so, Darrah acted in the course of her business, profession, or

employment, and during a transaction in which she had a financial interest.

70.     WEG relied on the false and incomplete information supplied by Darrah and was

justified in relying on that information.

71.     WEG suffered damages as a direct and proximate result of relying on Darrah's

misrepresentations and omissions, in amounts to be proven at trial.

## COUNT FOUR

### (Breach of Contract)

72.     WEG hereby incorporates by reference each of the allegations contained in

paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73.     As set forth above, WEG and Darrah formed a contract by entering into the APA

on or around November 11, 2021.

74.     WEG has performed any and all conditions precedent to its right to demand

performance by Darrah under the APA.

75.     By virtue of the conduct described in this Complaint, which rendered false the

representations and warranties included in the APA, Darrah breached the representations and

warranties included in the APA, including the representations and warranties set forth in Sections

4.5, 4.6, 4.9, 4.10, 4.11, 4.13, and 4.20 of the APA, which provide as follows:

a. **4.5 Lawsuits and Proceedings.** Neither Seller nor any Shareholder is (i) subject to any outstanding injunction, judgment, order, decree, ruling, or charge, or (ii) a party to or, to the knowledge of the Shareholders, threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator.

b. **4.6 Condition and Sufficiency of Assets.** All of the Acquired Assets which constitute tangible personal property are in good condition, working order and repair (reasonable wear and tear excepted) and are usable and fit for their intended purposes. There are no defects in such Acquired Assets or other conditions relating to any Acquired Assets which, in the aggregate, materially adversely affect the Business or the operation or value of the Acquired Assets. The Acquired Assets comprise all of the assets that are necessary for the Purchaser to conduct the Business as it is conducted by the Seller and, except for the Excluded Assets, constitute all of the assets used by the Seller or any Shareholder in the Business.

c. **4.9 Material Contracts.** The Seller has provided to the Purchaser a true, correct and complete copy of each contract, agreement, instrument or understanding (written or oral) that is material to the Business or involves any arrangement between the Seller and any Shareholder or any of their respective affiliates, including all contracts with Current Clients (the "Material Contracts"). Each Material Contract is in full force and effect and constitutes a legal, valid and binding agreement, enforceable in accordance with its terms, of each party thereto, in each case, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to the enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The Seller has performed in all material respects all of its required obligations under each Material Contract, and is not in material violation or breach of or default under any Material Contract. The other parties to each Material Contract are not in material violation or breach of or default under such Material Contract. There exists no event, occurrence, condition or act which constitutes, or with the giving of notice or the lapse of time or both would become, a material default of any Material Contract. No event, occurrence, condition or act exists or has taken place which constitutes, or with the giving of notice or the lapse of time or both would constitute, a material default of any Material Contract by any party to a Material Contract other than the Seller.

d. **4.10 Compliance with Laws.** The Seller and each Shareholder has since January 1, 2016 complied in all material respects with all laws and regulations applicable to the Business, including but not limited to all federal or state securities laws and regulations (specifically including all requirements established in and pursuant to the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act")), and all laws and regulations regarding employment, employee benefits and environmental concerns. . . .

e.  **4.11 Client Lists** The Current Client List is an accurate and complete list of all Current Clients of the Business, along with all of their Current Client Assets under management, all Current Client Revenues (including Current Client RIA Revenues) associated therewith and any Consents needed therefrom. Except as set forth on Schedule 4, no Current Clients have withdrawn any assets exceeding 20% of their holdings since December 31, 2019 (which withdrawals, if any, are set forth on Schedule 4) and no clients that have exceeded $10,000 in annual revenues for the Business have ceased doing business with the Seller during the twelve month period prior to the date hereof. Neither the Seller nor any Shareholder have any reason to believe that any material portion of the Current Client Assets under management of the Business will be withdrawn or that any Current Clients will cease doing business with the Business following the Closing Date. The Seller has provided to the Purchaser complete access to all files in their possession with respect to the Current Clients. As a direct and proximate result of the foregoing breaches of the APA, WEG has suffered damages in an amount to be proven at trial.

f.  **4.13 Ownership; Other Businesses.** The Shareholders hold all issued and outstanding shares of capital stock of the Seller in the respective amounts set forth in Schedule 4.13(a). No person or entity other than the Seller or any Shareholder has any right, title or interest in and to the Business or the Acquired Assets. Neither the Seller nor any Shareholder or any Key Employee is engaged in any material business other than the Business, and set forth on Schedule 4.13(b) are all "outside business activities" engaged in by a Shareholder or a Key Employee that would require disclosure pursuant to Form ADV Part 2B brochure supplement ("Outside Business Activities").

g.  **4.20 Disclosure.** Neither the Seller nor any Shareholder has withheld any material facts relating to the Business or the Acquired Assets from the Purchaser. No representation or warranty in this Agreement contains any untrue statement of a material fact or omits or will omit to state any material fact required to be stated herein or therein or necessary to make the statements herein or therein not misleading. Without limiting the scope of the foregoing, no Shareholder is aware of any change, event or occurrence that has taken place or is pending that has, or in the future could reasonably be expected to have, a material adverse effect on the value or ownership of the Business or the Acquired Assets.

76.  WEG's contract claims against Darrah related to the APA are equitably tolled by virtue of the nature of the relationship between WEG and Darrah, as well as Darrah's conduct in fraudulently concealing the conduct and breaches in question.  As a result of Darrah's concealment of the facts at issue, WEG was not aware of the breaches until September 2023 and

is still not aware of the full extent of Darrah's breaches.  Therefore WEG's claims are timely under the APA.

77.     As a direct and proximate result of the foregoing breaches of the APA, WEG has suffered damages in an amount to be proven at trial.

## COUNT FIVE

### (Breach of Express Warranty – APA)

78.     WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79.     As set forth above, WEG and Darrah formed a contract by entering into the APA on or around November 11, 2021.

80.     In the APA, Darrah made express warranties by affirmation, including those described above in Sections 4.5, 4.6, 4.9, 4.10, 4.11, 4.13, and 4.20 of the APA.

81.     Darrah breached certain express warranties included in the APA, including the warranties in Sections 4.5, 4.6, 4.9, 4.10, 4.11, 4.13, and 4.20 of the APA.

82.     WEG has performed any and all conditions precedent to its right to demand performance by Darrah under the APA.

83.     As a direct and proximate result of the foregoing breaches of the APA, WEG has suffered damages in an amount to be proven at trial.

## COUNT SIX

### (Breach of Contract – Sr. VP Advisor Agreement)

84.     WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 83 of this Complaint as though fully set forth herein.

85.     As set forth above, WEG and Darrah formed a contract by entering into the Advisor Agreement on or around November 11, 2011.

86.     Darrah made various representations and agreements through the Advisor Agreement, including those set forth in Sections 1, 4(d), 5, 6(a), and 6(b) and 9(a), which provide as follows:

a.   "You also agree to follow all company policies and procedures as may be amended from time to time by WEG with or without notice. In all activities, you will lead in a fashion that is consistent with the policies and guidelines established from time to time by WEG or any Affiliated Entities."  (¶ 1);

b.   "Compliance with Regulations. All elements of compensation payable to you hereunder must in any event be subject to continuing compliance in all material respects with applicable federal and state regulatory requirements and the policies and procedures of WEG and all Affiliated Entities."  (¶ 4(d));

c.   "**Warranties, Representations and Duties**. You agree to adhere to high standards of financial planning, quality advice and customer service, as reasonably determined by the applicable Affiliated Entity, to increase the demand for products and services offered by all FAs and to protect the reputation and goodwill of WEG and its Affiliated Entities. You warrant and represent to WEG that you have no contractual commitments (including, but not limited to, non-compete agreements, non-solicitation agreements, employment agreements, or confidentiality agreements) inconsistent with your obligations set forth in this Agreement."  (¶ 5);

d.   "You agree to use reasonable efforts in your duties and responsibilities along with any duties that may be assigned as additional and/or different duties, provided that such additional and/or different duties are consistent with this Agreement and your position. You agree to devote your full business-time attention, energy, and ability to the business of WEG; provided that the foregoing shall not prevent you from (i) participating in charitable, civic, educational, professional, community, or industry affairs, or (ii) managing your passive personal investments, so long as, in each case, such activities are reported as outside business activities for each Applicable Affiliated Entity and such activities individually or in the aggregate do not materially interfere or conflict with your duties hereunder or create a potential business or fiduciary conflict. You further agree to comply with all federal, state and local laws or regulations and follow WEG's policy and procedures."  (*Id.*);

e.   "You agree to promptly respond to requests for information and records from WEG and any Affiliated Entity."  (¶ 5(a));

f.  "Client Service. You will: (i) promptly submit complete and accurate applications for the services and other financial information required by any applicable Affiliated Entity to comply with legal, regulatory, underwriting or WEG's internal processing requirements; (ii) promptly forward all payments received from clients for services as directed by WEG; (iii) use reasonable efforts to maintain and increase customer relations; (iv) render competent, prompt, courteous, and knowledgeable service; and (v) meet or exceed such reasonable standards as WEG or any Affiliated Entity may establish from time to time."  (¶5 (c));

g.  "Notice. You agree to notify WEG and each Affiliated Entity promptly but no more than one business day after you becoming aware of the occurrence of…(vi) any [ ] matter that would be required to be disclosed on Form ADV or Form BD as applicable under federal or state securities laws and regulations." (¶ 6(a));

h.  "You agree to…cooperate with Inspectors [WEG, any Affiliated Entity and their respective agents, and any governmental and regulatory agencies that are required to have access by law] in such inspections by rendering such assistance as they may reasonably request, including access to all books and records, including computerized books and records"  (¶ 6(b)); and

i.  "Cease Activities. Upon termination of employment for any reason, you agree not to directly or indirectly represent to the public or hold yourself out as a Sr. VP-FA of WEG. You agree to immediately cease to use, in any manner whatsoever, any Confidential Information or Intellectual Property (as each such term is defined in the RC Agreement). This restriction as to trade secrets shall be perpetual. This restriction as to Confidential Information and Intellectual Property shall be for the maximum duration permitted by applicable law." (¶ 9(a))."

87.     Darrah breached Sections 1, 4(d), 5, 6(a), and 6(b) and 9(a) of the Advisor

Agreement in various ways, including, but not limited to: (1) violating WEG policy and

procedures, government regulations and the law; (2) failing to adhere to high standards for her

clients; (3) concealing contractual obligations inconsistent with the Advisor Agreement,

including her role as a trustee and beneficiary of client trusts, her Power of Attorney for clients,

and personal loans with clients; (4) failing to devote her full business-time attention, energy, and

ability to the business of WEG—instead devoting a significant amount of her time to OBAs; (5)

repeated refusals to respond to inquiries from WEG and to cooperate with WEG's investigation

into her wrongdoing; and (6) continuing to hold herself out to clients as an agent of WEG after

she was placed on leave and continuing to reach out to and visit clients after she was terminated for cause.

88.     As a direct and proximate result of the foregoing breaches of the Advisor Agreement, WEG has suffered damages in an amount to be proven at trial.

## COUNT SEVEN

### (Breach of Contract – Shareholder Restrictive Covenants Agreement)

89.     WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 88 of this Complaint as though fully set forth herein.

90.     As set forth above, WEG and Darrah formed a contract by entering into the Shareholder Restrictive Covenants Agreement on or around November 11, 2021, through which Darrah agreed not to use any of Vivid's confidential information—including any client information—in a manner not directly related to and required by the performance of her duties to WEG (¶ I(a)).

91.     WEG has performed any conditions precedent to its right to demand performance by Darrah under the Shareholder Restrictive Covenants Agreement.

92.     Darrah breached the Shareholder Restrictive Covenants Agreement, including Section I(a) by using her knowledge of specific WEG clients, their account information, and their contact information to steal their money and to inappropriately contact them after she was placed on leave and terminated.

93.     As a direct and proximate result of the foregoing breaches of the Shareholder Restrictive Covenants Agreement, WEG has suffered damages in an amount to be proven at trial.

## COUNT EIGHT

### (Indemnification)

94.     WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 93 of this Complaint as though fully set forth herein.

95.     As described above, Darrah engaged in fraudulent and unlawful conduct, which has led to a regulatory inquiry, which constitutes a third party claim under the APA.

96.     Further, Darrah breached the Representations and Warranties in Sections 4.5, 4.6, 4.9, 4.10, 4.11, 4.13, and 4.20 of the APA, as alleged above.

97.     As a direct consequence of the wrongful conduct alleged herein, WEG has suffered, and will suffer, substantial monetary damages in an amount to be determined at trial.

98.     Concurrent with this Complaint, WEG has served the notice required pursuant to Sections 9.8(a) and 9.9 of the APA describing the bases for the claims for indemnification made herein.

99.     As a result of the fraud perpetuated on WEG by Darrah, Darrah must indemnify WEG for the full amount of WEG's losses in connection with the conduct and misrepresentations alleged in this Complaint.

100.     WEG therefore seeks indemnity for all losses resulting from Darrah's wrongful conduct alleged in this Complaint (including those relating to its investigation and compliance with the regulatory inquiry), and relating to the breached representations and warranties in the APA.

101.     By reason of Darrah's conduct and misrepresentations, described above, WEG is entitled to recover damages, including without limitation rescissory, consequential, and expectation damages in an amount to be determined at trial.  WEG is also entitled to recover

restitution, including costs and attorneys' fees and other relief as the Court may deem just and equitable.

102.   WEG's claims against Darrah related to violations of the representations and warranties in the APA are equitably tolled by virtue of the nature of the relationship between WEG and Darrah, as well as Darrah's conduct in fraudulently concealing the conduct and breaches in question.  As a result of Darrah's concealment of the facts at issue, WEG was not aware of the breaches until September 2023 and is still not aware of the full extent of Darrah's breaches.  Therefore WEG's claims are timely under the APA.

<u>**COUNT NINE**</u>

**(Breach of Fiduciary Duties of Care and Loyalty)**

103.   WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 102 of this Complaint as though fully set forth herein.

104.   Following WEG's purchase of the assets of Vivid and execution of the Advisor Agreement and Darrah's position as a Vice President of WEG, WEG placed trust and confidence in Darrah to manage relationships with clients of WEG.

105.   Darrah became an agent of WEG upon the execution of the Advisor Agreement and, as such, Darrah owed fiduciary duties to WEG, including the duties of care, loyalty, disclosure, and candor.

106.   Darrah breached her fiduciary duties to WEG by supplying false and misleading information and failing to disclose material information, including the following misrepresented or omitted facts:  (1) failing to disclose that she was serving as a trustee for clients—in violation of law and WEG policy—and expressly lying to and misleading WEG into believing that she was only serving as a secondary trustee on some client accounts, omitting others; (2) failing to

disclose OBAs of which she was heavily involved with, using WEG staff to help operate, and running out of WEG's office; (3) failing to disclose personal loans she received from clients; (4) on information and belief, forging client documents; (5) instructing personnel to effectuate client transactions that she misrepresented were approved by clients; (6) failing to disclose that she had caused client accounts to be linked to her telephone number, email address, and mailing address for properties she owned; and (7) failing to disclose that she had been stealing millions of dollars from clients.

107.    In addition, Darrah breached her fiduciary duties to WEG by engaging in, at least, the following misconduct: (1) stealing money from former Vivid clients who became clients of WEG pursuant to the APA; (2) withdrawing funds under WEG's management for her own personal benefit; (3) inappropriately contacting WEG clients and holding herself out to clients as an agent of WEG after she was placed on leave and terminated for cause; (4) instructing WEG personnel to effectuate client transactions that were not approved by clients; (5) circumventing internal controls and anti-fraud mechanisms for her own benefit; and (6) using WEG resources and staff to provide services to non-WEG businesses owned or funded by Darrah.

108.    Darrah's breach of her fiduciary duties—which continued through her entire employment with WEG—were fraudulent and corrupt, thereby requiring Darrah to forfeit all compensation she earned through her employment with WEG.

109.    As a direct and proximate result of the foregoing conduct, WEG has suffered damages in an amount to be proven at trial.

**COUNT TEN**

**(Professional Negligence)**

110.     WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 109 of this Complaint as though fully set forth herein.

111.     As set forth above, Darrah owed WEG a duty of care as a result of, *inter alia*, the Advisor Agreement, the principal-agent relationship between Darrah and WEG, and applicable law.

112.     Darrah breached her duty of care by engaging in the conduct set forth above, including by: (1) stealing money from former Vivid clients who became clients of WEG pursuant to the APA; (2) withdrawing funds under WEG's management for her own personal benefit; (3) inappropriately contacting WEG clients and holding herself out to clients as an agent of WEG after she was placed on leave and terminated for cause; (4) instructing WEG personnel to effectuate client transactions that were not approved by clients; (5) circumventing internal controls and anti-fraud mechanisms for her own benefit; and (6) using WEG resources and staff to provide services to non-WEG businesses owned or funded by Darrah.

113.     But for Darrah's conduct, the events set forth above would not have occurred.

114.     As a direct and proximate result of the foregoing conduct, WEG has suffered reasonably foreseeable damages in an amount to be proven at trial.

**COUNT ELEVEN**

**(Unjust Enrichment)**

115.     WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 114 of this Complaint as though fully set forth herein.

116.    WEG conferred benefits on Darrah in connection with the APA in excess of $75,000.

117.    Darrah accepted the benefits conferred by WEG.

118.    As described above, Darrah induced WEG to enter the APA by fraudulent misrepresentation, and engaged in fraudulent and unlawful conduct with respect to WEG clients, such that it would be inequitable for Darrah to retain the benefits conferred by WEG.

119.    Darrah's unjust enrichment was at the expense of WEG, therefore WEG is entitled to restitution from Darrah.

## COUNT TWELVE

**(Declaratory Relief)**

120.    WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 119 of this Complaint as though fully set forth herein.

121.    By virtue of the conduct described in this Complaint, WEG is likely to face claims and inquiries from third parties including regulators and clients of Darrah, as well as related costs and burdens.

122.    WEG seeks declaratory relief in the form of a determination that Darrah is obligated to indemnify WEG for such third-party claims related to the misconduct described in this Complaint.

## COUNT THIRTEEN

**(Interference With Prospective Economic Advantage)**

123.    WEG hereby incorporates by reference each of the allegations contained in paragraphs 1 through 122 of this Complaint as though fully set forth herein.

124.    WEG had a reasonable expectation of economic advantage and benefit resulting from WEG's acquisition of the Acquired Assets.

125.    Darrah knew about WEG's reasonable expectation of such economic advantage and benefit because she was one of the sellers of the Acquired Assets and a party to the APA.

126.    Darrah intentionally interfered with WEG's reasonable expectation of such economic advantage and benefit through the conduct described above, including: (1) stealing money from former Vivid clients who became clients of WEG pursuant to the APA; (2) withdrawing funds under WEG's management for her own personal benefit; (3) inappropriately contacting WEG clients and holding herself out to clients as an agent of WEG after she was placed on leave and terminated for cause; (4) instructing WEG personnel to effectuate client transactions that were not approved by clients; (5) circumventing internal controls and anti-fraud mechanisms for her own benefit; and (6) using WEG resources and staff to provide services to non-WEG businesses owned or funded by Darrah.

127.    Darrah's intentional interference was fraudulent and/or in violation of federal statutes, as described above.

128.    In the absence of the wrongful acts of Darrah, it is reasonably probable that WEG would have realized economic advantage and benefit resulting from WEG's acquisition of the assets of Vivid.

129.    As a direct and proximate result of the foregoing conduct, WEG has suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.    For damages in an amount to be proven at trial, well in excess of the jurisdictional

threshold of $75,000;

     2.      For injunctive relief, including enjoining Darrah from continuing to contact clients who are victims of her misconduct;

     3.      For indemnification;

     4.      For complete or partial rescission of the Asset Purchase Agreement;

     5.      For restitution in an amount to be proven at trial;

     6.      For declaratory relief, including declaratory judgment;

     7.      For disgorgement of ill-gotten gains, well in excess of $1 million;

     8.      For attorneys' fees and costs of suit incurred herein or in other proceedings related to the allegations in this Complaint, as allowed by law and contract; and

     9.      For such other and further relief and remedies as the Court may deem to be just and equitable under the circumstances.

Dated:  September 29, 2023

By: */s/ Wallace G. Hilke*
Wallace G. Hilke (SBN 0175857)
hilkew@ballardspahr.com
**BALLARD SPAHR LLP**
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2119
Tel.: 612.371.3298
Fax: 612.371.3207

Jonathan Acker Shapiro (*Admission Forthcoming*)
JShapiro@goodwinlaw.com
**GOODWIN PROCTER LLP**
3 Embarcadero Center
San Francisco, CA 94111
Tel.: 415.733.6202
Fax: 415.276.3064

Nicole L. Chessari (*Admission Forthcoming*)
NChessari@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA 94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

Robert Tiefenbrun (*Admission Forthcoming*)
RTiefenbrun@goodwinlaw.com
**GOODWIN PROCTER LLP**
601 South Figueroa Street, Suite 4100
Los Angeles, California  90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Plaintiff
Wealth Enhancement Group, LLC